FILED
APR 0 8 2008
APR 08 2008
Judge Blanche M. Manning
United Sta... Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 07 CR 771 |
| v. | ) | |
| | ) | Judge Blanche M. Manning |
| NICHOLAS DELUCA | ) | |

## DEFENDANT'S NICHOLAS DELUCA'S PLEA DECLARATION

### Charges in this Case

1. The information in this case charges defendant with one count of mail fraud, in violation of Title 18, United States Code, Section 1341 (Count One), and one count of access device fraud, in violation of Title 18, United States Code, Section 1029(a)(2) (Count Two).

### Factual Basis

2. Defendant admits the following facts with respect to the charge in Count One of the information:

During the period between 2001 and 2004:

(a) Defendant, a resident of Arizona, engaged in the business of selling two-way radios to the public, including customers solicited on the Internet. Defendant used various names, including "apcosystem," "kickitinn," "watchbuddy," and "whowonders," when offering radios for sale on the Internet auction websites of eBay and Yahoo!.

(b) Harold Pick, a resident of California, also was and still is engaged in the business of selling two-way radios to the public.

(c) Defendant and Harold Pick at times did business together, assisting one another in acquiring radio parts from Motorola, Inc. ("Motorola"), assembling those parts into

two-way radios, and programming the assembled radios with pirated Motorola software. Defendant and Harold Pick assembled radios at different locations, including defendant's residence in Tucson, Arizona, and a warehouse used by Harold Peck in Inglewood, California.

(d) Motorola, based in Schaumburg, Illinois, was a manufacturer and global provider of communication and information technology, software, products, and services for individuals and businesses. Among the products designed and manufactured by Motorola were two-way radios programmed with Motorola proprietary software, including Saber and XTS series radios.

(e) Motorola's proprietary software enabled users of its two-way radios to access and communicate on private trunked radio systems designed for certain authorized users, such as public safety and law enforcement departments. Motorola programmed each of its radios with a unique electronic serial number and with certain codes — known as "system IDs," "system keys," "unit IDs," "talk group IDs," and "flash codes" — to enable the radio user to gain access to particular trunked radio systems.

(f) Motorola customers could order radio parts directly from Motorola in one of three ways:

(i) by opening an account with Motorola's sales department and placing orders through that open account. Customers with an acceptable credit history could open the account on "open terms," meaning that Motorola would accept an order from the customer, ship the requested part, and allow the customer to make payment within 30 days. Customers with an unacceptable credit history could open an account on "credit card terms,"

meaning that the customer's order would be billed to a credit card or debit card account number provided by the customer;

    (ii)  by placing orders with Motorola's warranty replacement department for replacement of defective parts that were under warranty. Customers were required to return the defective parts to Motorola in exchange for new, replacement parts. Motorola also maintained an advance warranty return program pursuant to which Motorola would ship the replacement parts before receiving the defective parts from the customer. Under that advance warranty return program, Motorola would bill the customer for the cost of the replacement parts if Motorola did not receive the defective parts within 45 days; and

    (iii)  by ordering parts through Motorola's module exchange program, pursuant to which Motorola would replace obsolete parts with new parts at prices below retail. Motorola would ship the new parts and charge the customer's credit or debit card account after receiving the obsolete parts from the customer.

  (g)  Motorola shipped radio parts from a distribution center in Elgin, Illinois.

  (h)  Defendant and Harold Pick opened accounts and ordered parts from Motorola under various business names, including "C. Donnelly Communications," "The DeLuca Group," "Radio Hut," "Radio Communications Systems, Inc.," "Shadow Team Corporation," "Instacom Corporation," and "EPW Communications, Inc."

Beginning in or about 2001 and continuing until in or about February 2004, at Schaumburg, Illinois; Tucson, Arizona; Inglewood, California, and elsewhere, defendant, together with Harold Pick, devised and participated in a scheme to defraud and to obtain property from Motorola, specifically, parts for two-way radios, costing a total of more than $946,000, by

means of materially false and fraudulent pretenses, representations, and promises. As described below, defendant and Harold Pick used fraudulently-obtained radio parts, together with pirated Motorola software, to assemble counterfeit Motorola two-way radios for sale to the public.

Defendant and Harold Pick opened a number of accounts with Motorola so that they could continuously order radio parts on credit and not pay for them. Defendant and Harold Pick used different business names, including C. Donnelly Communications, The DeLuca Group, Radio Hut, Radio Communications Systems, Inc., Shadow Team Corporation, Instacom Corporation, and EPW Communications, Inc., and different addresses, including residences, rental suites, and mail boxes in Arizona, California, and Nevada, when opening accounts and ordering parts from Motorola. Defendant and Harold Pick used different business names and addresses to conceal their fraudulent scheme to obtain radio parts without paying for them.

After defendant and Harold Pick opened accounts with Motorola, they ordered a variety of radio parts. Defendant and Harold Pick placed numerous false orders for the replacement of allegedly defective parts that were under warranty. Some of those orders were false in that defendant and Harold Pick did not have defective radio parts in their possession which they had legitimately acquired from Motorola and which they intended to return in exchange for new parts. In addition to placing false warranty replacement orders, defendant and Harold Pick ordered new parts on account and under Motorola's module exchange program. Defendant and Harold Pick provided Motorola with MasterCard and Visa account numbers for billing purposes, knowing that they did not intend to fully honor all of the charges that they would be placing on those accounts. Motorola filled their orders by shipping over $6,000 worth of radio parts that were ordered under the name of C. Donnelly Communications; over $97,000 worth of radio parts

that were ordered under the name of The DeLuca Group; over $227,000 worth of radio parts that were ordered under the name of Radio Hut; over $31,000 worth of radio parts that were ordered under the name of Radio Communications; over $199,000 worth of radio parts that were ordered under the name of Shadow Team; over $56,000 worth of radio parts that were ordered under the name of Instacom; and over $330,000 worth of radio parts that were ordered under the name of EPW Communications.

Defendant and Harold Pick did not pay for all of the radio parts that they had ordered and received from Motorola. Nor did they return to Motorola the allegedly defective radio parts for which they had claimed replacements from Motorola. When Motorola sought to obtain reimbursement by charging the MasterCard and Visa account numbers that had been provided by defendant and Harold Pick, Motorola's charges were dishonored because the accounts contained insufficient funds or because the account numbers that had been provided to Motorola were otherwise invalid.

Defendant and Harold Pick shared the radio parts that they had fraudulently-obtained from Motorola. Defendant and Harold Pick used those radio parts to construct counterfeit Motorola radios.

Defendant and Harold Pick programmed the counterfeit Motorola radios that they had constructed with fraudulently-obtained Motorola radio parts. They programmed at least some of the counterfeit radios with pirated Motorola proprietary software that they had obtained without Motorola's knowledge or authorization.

Defendant and Harold Pick advertised and offered their counterfeit radios for sale to the public as authentic Motorola radios, at times marking the counterfeit radios with Motorola

trademarked labels, thereby creating the false impression that the radios were manufactured, tested, and licensed by Motorola. Defendant and Harold Pick offered and sold their counterfeit radios at prices substantially below Motorola's suggested retail prices for comparable models manufactured by Motorola. Defendant and Harold Pick profited, at Motorola's expense, by selling counterfeit radios which they constructed with parts for which they had not paid Motorola.

For the purpose of executing the scheme described above, on or about April 7, 2003, at Elgin, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant knowingly caused to be delivered by FedEx, a commercial interstate carrier, according to the direction thereon, approximately $1,831 worth of Motorola radio parts, which parts were shipped from Motorola's distribution center in Elgin, Illinois, to "EPW Communications Inc., 1517 N. Wilmot St., #133, Tucson, AZ 85712," which address was a mail box rented by defendant at a commercial mail receiving facility in Tucson, Arizona.

Beginning several years ago, the Defendant began cooperating with Motorola against Harold Pick. He gave depositions, statements and information to Motorola. Motorola in exchange agreed to release the Defendant from liability. The Defendant will contend that the Court should take the Defendant's cooperation into consideration when sentencing him. The Government has chosen not to charge Harold Pick. Therefore, the Government will not agree that Mr. DeLuca's cooperation warrants consideration by this Court. The Government will not make a motion that the Court depart downward from the advisory guidelines because of cooperation.

3.  Defendant admits the following facts with respect to the charge in Count Two of the information:

During the period between about February 2003 and July 2003, at Grand Rapids, in the Western District of Michigan, Southern Division, and elsewhere, defendant, with the aid of individual A knowingly and with intent to defraud trafficked in unauthorized access devices, and by such conduct obtained money in an amount aggregating more than $1,000, thereby affecting interstate commerce; more specifically, defendant marketed "parts built" or "factory fresh" Motorola XTS radios via the Internet auction website of eBay, and sold at least four such radios to a retailer of portable radios in Grand Rapids, Michigan, for at least $750-$800 apiece, which radios were programmed with unauthorized flash codes and serial numbers.

## Maximum Statutory Penalties

4.  Defendant understands that the charges to which he is pleading guilty carries the following statutory penalties:

   a.  **Count One.** A maximum sentence of 20 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the Court also may impose a term of supervised release of not more than three years.

   b.  Defendant further understands that the Court must order restitution to Motorola, the victim of the offense, in an amount determined by the Court.

   c.  In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on this charge, in addition to any other penalty or restitution order imposed by the Court.

      d.    **Count Two.** A maximum sentence of 10 years' imprisonment. This offense also carries a maximum fine of $250,000. Defendant further understands that the Court also may impose a term of supervised release of not more than three years.

      e.    In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on this charge, in addition to any other penalty imposed by the Court.

      f.    Therefore, the total maximum sentence which could be imposed by the Court is 30 years of imprisonment; a fine which may exceed $500,000, as described above; a term of supervised release; a special assessment totaling $200; together with any restitution ordered by the Court.

## Sentencing Guidelines Calculations

5.    Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

6.    For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a. **Applicable Guidelines.** The Sentencing Guidelines to be applied in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely, the November 2007 Guidelines Manual.

b. **Offense Level Calculations.**

i. The charges in Counts One and Two of the information are grouped pursuant to Guideline § 3D1.2(d).

ii. The base offense level applicable to the group is 7, pursuant to Guideline § 2B1.1(a)(1), because the mail fraud offense has a statutory maximum term of imprisonment of 20 years.

iii. The base offense level should be increased by 14 levels under Guideline § 2B1.1(b)(1)(H) because the amount of the loss is more than $400,000 but not more than $1,000,000.

iv. The offense level should be increased by an additional 2 levels under Guideline § 2B1.1(b)(10)(B)(i) because the offense involved the trafficking of unauthorized access devices (namely, two-way radios programmed with pirated or fraudulently-obtained Motorola proprietary software codes and electronic serial numbers for gaining access to private trunked radio systems). The Defendant does not agree that this additional 2 levels applies to this case.

v. The Government will argue at sentencing that the offense level should be increased by an additional 2 levels under Guideline § 3B1.3 because defendant used a special skill (namely, his skills in constructing and programming

9

Motorola radios) in a manner that significantly facilitated the commission of the offenses. The Defendant will urge the Court not to apply such enhancement.

   vi. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), a 2-level reduction in the offense level will be appropriate.

   vii. In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a 2-level reduction for acceptance of responsibility, the government will move for an additional 1-level reduction in the offense level.

  c. **Criminal History Category.** Based on the following facts, defendant's criminal history points equal 5 and defendant's criminal history category is III: On or about July 7, 2000, defendant was convicted in Pima County (Arizona) Superior Court of two counts of theft and sentenced to 12 months' imprisonment and 7 years' probation. That conviction results in 2 criminal history points under Guideline § 4A1.1(b) because the sentence exceeded 60 days; 2 criminal history points under Guideline § 4A1.1(d) because defendant committed the instant offense while under the term of probation imposed in that case; and an additional 1 criminal history point under Guideline § 4A1.1(e) because defendant committed the instant offense less than two years after release from imprisonment in that case.

      d.     **Anticipated Advisory Sentencing Guidelines Range.** Based on the above calculations including the two points for special skill and two points for the sale of access devices, the anticipated offense level total is 22, which, when combined with the anticipated criminal history category of III, results in an anticipated advisory Sentencing Guidelines range of 51-63 months' imprisonment. Without the enhancements, the offense level is a total of 18 which results in an advisory Sentencing Guidelines range of 33 to 41 months.

### Waiver of Rights

7.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

      a.     **Right to be charged by indictment.** Defendant understands that he has a right to have the charges prosecuted by an indictment returned by a concurrence of 12 or more members of a grand jury consisting of not less than 16 and not more than 23 members. By signing this Agreement, defendant knowingly waives his right to be prosecuted by indictment and to assert at trial or on appeal any defects or errors arising from the information, the information process, or the fact that he has been prosecuted by way of information.

      b.     **Venue.** Defendant further understands that he has a right to be prosecuted for the access device fraud offense (Count Two) in the district or districts where the offense was committed, including the Western District of Michigan. By signing this Agreement, defendant knowingly consents to prosecution of that offense in the Northern District of Illinois and waives any objection to the venue of this prosecution.

c. **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorneys would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

    v.  At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorneys would be able to cross-examine them.

    vi.  At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence. At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

### THE PLEA IS VOLUNTARY AND NO PROMISES HAVE BEEN MADE TO INDUCE DEFENDANT TO ENTER INTO IT.

No promises or threats have been made to this Defendant in connection with this case or to induce him to plead guilty. No one has indicated to him what his sentence will be. At sentencing the Defendant understands that it is the Judge who makes the final decision as to his sentence.

Respectfully submitted,

*/s/ Ronald J. Clark*
Ronald J. Clark, Attorney for Nicholas DeLuca

Ronald J. Clark
Attorney for Nicholas DeLuca
820 West Jackson Blvd.
Suite 300
Chicago, Illinois 60604
312-307-0061

Agreed

*/s/ Nicholas DeLuca*
Nicholas DeLuca
4/8/2008

13